IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AVENAL POWER CENTER, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:10-cv-00383-RJL |
| | ) | (Hon. Richard J. Leon) |
| U.S. ENVIRONMENTAL PROTECTION | ) | |
| AGENCY and  LISA P. JACKSON, in her | ) | |
| capacity as Administrator of the | ) | |
| U.S. Environmental Protection Agency | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff Avenal Power Center, LLC ("Plaintiff" or "Avenal") brought this action pursuant to the citizen suit provision of the Clean Air Act ("CAA" or "Act"), 42 U.S.C. § 7604(a)(2), to compel Defendants, U.S. Environmental Protection Agency and Lisa P. Jackson, Administrator ("EPA"), to grant or deny its permit application pursuant to CAA section 165(c), 42 U.S.C. § 7475(c), which requires the Agency to do so within one year of the filing of a complete application.  EPA does not dispute that it has failed to act on Plaintiff's permit application within one year of declaring the application complete.  Accordingly, the only issue to be resolved in this suit is the question of remedy – *i.e.*, the appropriate deadline by which EPA must grant or deny Plaintiff's permit application.  Because EPA cannot conclude review of Plaintiff's permit application on any schedule more expedited than that proposed herein, EPA requests that its motion for summary judgment on remedy be granted, and that the Court enter an

1

order adopting EPA's proposed deadline.

## BACKGROUND

## I.   STATUTORY BACKGROUND

### A.  THE CLEAN AIR ACT

Prior to beginning construction of a facility that will emit air pollution in excess of specified levels in an area that meets ambient air quality standards established by EPA, a party must obtain a permit that contains emission limitations that will prevent significant deterioration of the air quality in the area where the facility will be located—a Prevention of Significant Deterioration permit, or "PSD permit." 42 U.S.C. §§ 7475(a)(1), 7479(1).  To obtain a PSD permit, an applicant must, among other things, demonstrate that the facility "will not cause, or contribute to, air pollution in excess of any . . . national ambient air quality standard in any air quality control region."  42 U.S.C. § 7475(a)(3).  Similarly, EPA regulations require that an applicant "demonstrate that allowable emission increases from the [facility], in conjunction with all other applicable emission increases or reductions . . . , would not cause or contribute to air pollution in violation of (1) any national ambient air quality standard in any air quality control region."  40 C.F.R. § 52.21(k).  Under the CAA, EPA has established national ambient air quality standards ("NAAQS") that are required to "protect public health" while "allowing for an adequate margin of safety."  42 U.S.C. § 7409(b)(1).  EPA must review each NAAQS every five years and revise them if necessary to meet such criteria.  42 U.S.C. §§ 7409, 7409(d)(1).

CAA section 165(c) requires that a PSD permit application "be granted or denied not later than one year after the date of filing of such completed application."  42 U.S.C. § 7475(c).  EPA's procedures for reviewing permit applications are contained in 40 C.F.R. Part 124.  Under

the CAA and Part 124, EPA must provide the public with an opportunity to submit written and oral comments on proposed PSD permits and denials, and provide the public with notice that "all data submitted by the applicant" is part of the administrative record, during the permit review process. *See* 42 U.S.C. § 7475(a)(2); 40 C.F.R. §§ 124.1(c), 124.10-12.  CAA section 165(e) provides that EPA regulations must "require the results of [the air quality analysis] be available at the time of the public hearing on the application for [the PSD] permit."  42 U.S.C. § 7475(e)(3)(c).

The regulations generally provide for a 30-day public comment period, and also provide that notice is to be given at least 33 days prior to EPA's holding a public hearing or before a comment period closes, when notice is given by mail.  *See* 40 C.F.R. §§ 124.10-12, 124.20(d). In addition, EPA must respond to all significant comments raised during the public comment period or during any hearing.  40 C.F.R. § 124.17(a).  After EPA reviews and responds to public comments, the EPA Regional Administrator, or his or her delegate, for the EPA Region responsible for reviewing the permit application must take action by granting or denying the permit application.  *See* 40 C.F.R. §§ 124.15, 124.17-18.

Any person who commented on the draft permit or participated in a public hearing during the permit review process may challenge the final Regional permit decision by filing a Petition for Review of the final permit decision before the EPA's Environmental Appeals Board ("EAB").  *See* 40 C.F.R. § 124.19; *see also* 40 C.F.R. § 124.2 (definition of "Environmental Appeals Board"); 57 Fed. Reg. 5320 (Feb. 13, 1992) (describing the role of the EAB).  The EAB has the discretion to refer an appeal to the EPA Administrator for resolution, *see* 40 C.F.R.

§ 124.2, but Part 124 does not authorize the EPA Administrator or the Regional Office to issue a final and effective permit decision without providing an opportunity for an appeal of that permit. The issuance or denial of a PSD permit does not become a final agency action for purposes of judicial review until the exhaustion of the EPA administrative review procedures, including appeal to the EAB. *See* 40 C.F.R. § 124.19(f).

### B.  THE ENDANGERED SPECIES ACT

Under section 7 of the Endangered Species Act, federal agencies must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species . . . . ." 16 U.S.C. § 1536; *see generally* 50 C.F.R. Part 402. This is done through the agency's consultation with the United States Fish & Wildlife Service ("FWS"), which is concluded by the issuance of a "biological opinion" by the FWS. *Id.* "Following the issuance of the biological opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion." 50 C.F.R. § 402.15(a).

## II.  PLAINTIFF'S PERMIT APPLICATION BACKGROUND

Avenal is the developer of the proposed Avenal Energy Project ("the Project"), a 600-megawatt natural gas-fired power plant. Compl. ¶¶ 2, 10. Avenal first contacted EPA Region 9 in August 2007 regarding the application process for securing a PSD permit for the Project. Compl. ¶¶ 2, 19; Answer ¶¶ 2, 19. Avenal submitted its initial PSD permit application for the Project to EPA in February 2008. Compl. ¶¶ 5, 20; Compl. Ex. A; Answer ¶¶ 5, 20, 21. On March 19, 2008, EPA Region 9 notified Avenal, by letter, that its PSD permit application was complete as of that date. Compl. ¶¶ 5, 21; Answer ¶¶ 5, 21; Pls. Ex. A.

After EPA Region 9 issued its letter notifying Avenal that its PSD permit application was complete, EPA Region 9 processed the application by conducting its own internal analysis of the information provided, communicating regularly with Avenal concerning additional information EPA deemed necessary, and considering additional information received from Avenal. Declaration of Deborah Jordan (hereinafter "Jordan Decl.") ¶ 8. For example, on March 31, 2008, EPA requested additional information from Avenal, and on April 10, 2008, Avenal provided its response to that request. *See* Joint Stipulation of Facts ("Joint Stip."), Docket Entry 11, ¶ 6, and on June 6, 2008, EPA requested additional information regarding AEP's startup/shutdown. *Id.* On October 28, 2008, Avenal notified EPA that it had reduced its proposed carbon monoxide ("CO") limit to 2.0 ppm to address EPA concerns. *Id.* On November 17, 2008, Avenal and EPA had a permit status meeting in San Francisco. *Id.* On February 23, 2009, EPA requested an additional impacts analysis from Avenal, and on March 11, 2009, Avenal submitted the requested additional impacts analysis. *Id.*

Additionally, to ensure compliance with section 7 of the ESA and its implementing regulations, EPA Region 9 took the necessary steps to move forward with consultation regarding the Project with the FWS. Specifically, after receiving a biological assessment from Avenal, EPA Region 9 requested initiation of formal consultation with the FWS, and preparation of a biological opinion, to address potential impacts to the San Joaquin Kit Fox on July 10, 2008. Joint Stip. ¶ 6; Jordan Decl. ¶ 11 and Ex. 2 (July 10, 2009 letter requesting initiation of formal consultation). EPA also requested the FWS's written concurrence that the Project was not likely to adversely affect certain other federally listed endangered plant and wildlife species. *Id.* On September 9, 2008, the FWS requested additional information from EPA Region 9. Joint Stip. ¶

6.  On October 1, 2008, Avenal submitted to EPA Region 9 information to respond to FWS's

September 8, 2008 letter to EPA, and on October 22, 2008, EPA Region 9 provided additional

information requested by FWS.  *Id.*

   EPA Region 9 issued a proposed PSD permit for the Project and its Statement of Basis

and Ambient Air Quality Impact Report on June 16, 2009, and thereby initiated the public

comment period for the Project's PSD permit.  Pls. Ex. D and E.  Shortly after EPA Region 9's

issuance of the initial public notice on June 16, 2009, concerning the proposed PSD permit for

the Project, members of the public requested an extension of the public comment period, a public

meeting and hearing on the project, and public notice in Spanish.  Jordan Decl. ¶ 9.  On August

27, 2009, EPA Region 9 issued a public notice concerning the proposed PSD permit, and

announced that it would hold a public information meeting on September 30, 2009, and a public

hearing on October 1, 2009, and that the close of the public comment period would be extended

to October 15, 2009.  Pls. Ex. E.  Members of the public expressed concern about conflicting

public proceedings in the area, and EPA determined that a supplemental public hearing would be

appropriate.  Jordan Decl. ¶ 9.  EPA Region 9 therefore issued an additional public notice on

September 11, 2009 stating that a supplemental public hearing would be held on October 15,

2009, the date on which the public comment period was scheduled to close.  Pls. Ex. E.  The

public information meeting and two public hearings were held as scheduled, after which the

comment period for the proposed permit closed.  Jordan Decl. ¶ 9.

   EPA received public comments from dozens of organizations and individuals regarding

various issues presented by Avenal's proposed PSD permit.  Joint Stip. ¶ 10.  Following the close

of the comment period, EPA commenced work on considering and drafting the response to these

comments.  Jordan Decl. ¶10.  EPA discussed some of the issues raised in the comments with

Avenal, and reviewed and considered additional relevant information to submitted by Avenal

following the close of the comment period.   Jordan Decl. ¶ 10 and Ex. 1 ; Pls. Ex. H (May, 11

2010 letter from Sierra Research to Gerardo Rios).

While the public review process for the proposed PSD permit was ongoing, and

afterward, EPA Region 9 continued to work with FWS and Avenal on the ESA section 7

consultation for the Project.  On July 1, 2009, FWS issued its draft Biological Opinion for the

Project.  Joint Stip. at ¶ 10.  Between July 2009 and December 2009, EPA Region 9 and Avenal

provided comments on the draft Biological Opinion to the FWS.  *Id.*  EPA continued to contact

FWS regularly to inquire about the status of the final Biological Opinion, *see* Jordan Decl. ¶ 11,

which was not issued by FWS until August 9, 2010.  *See* Pls. Ex. L.

In the meantime, on February 9, 2010, EPA published a final rule establishing a primary

NAAQS for nitrogen dioxide ("NO2") based on a 1-hour averaging time ("hourly NO2

NAAQS").  75 Fed. Reg. 6474 (Feb. 9. 2010).  The CAA requires that EPA review existing

NAAQS and the underlying air quality criteria at 5-year intervals and revise the criteria and

standards as appropriate.  42 U.S.C. §§ 7409, 7409(d)(1).  Prior to the 2010 action, EPA had last

completed such a review in 1996.[1]  EPA retained the pre-existing NO2 NAAQS with an annual

averaging time, but in the 2010 rule, the EPA Administrator concluded that "the current NO2

---

[1]  EPA's February 9, 2010 rule was signed by the Administrator on January 22, 2010 to
comply with a deadline established under a Consent Decree entered by this court.  *Center for
Biological Diversity v. Johnson*, Civ. No. 05-1814 (LFO) (D.D.C.).   EPA first promulgated
identical primary and secondary NAAQS for NO2 (based on an annual average) on April 30,
1971.  *See* 36 Fed. Reg. 8186.  EPA completed reviews of the air quality criteria and NO2
standards in 1985 and 1996 with decisions to retain the annual standard each time.  *See* 50 Fed.
Reg. 25,532 (June 19, 1985); 61 Fed Reg. 52,852 (Oct. 8, 1996).

primary NAAQS alone is not requisite to protect public health with an adequate margin of safety" and that "the NO2 primary standard should be revised in order to provide increased public health protection against respiratory effects associated with short-term exposures, particularly for susceptible populations such as asthmatics, children, and older adults." [2]  75 Fed. Reg. at 6490.

The new hourly NO2 NAAQS became effective on April 12, 2010.  *See* 75 Fed. Reg. at 6474.  Prior to this date, EPA issued a memorandum explaining that applicable statutes and regulations preclude the Agency from issuing a PSD permit without a demonstration that the source will not cause or contribute to a violation of the new hourly NO2 standard.  *See* Jordan Decl., Ex. 5 (Memorandum from Stephen D. Page, EPA Office of Air Quality Planning and Standards, Applicability of the Federal Prevention of Significant Deterioration Permit Requirements to New and Revised National Ambient Air Quality Standards (Apr. 1, 2010) ("Page Memorandum")).  In two previous instances, EPA has established by rule exemptions for permit applications that were determined complete prior to the revision of a National Ambient Air Quality Standard for particulate matter.  *See* 40 C.F.R. 52.21(i)(1)(x)-(xi).[3]  However, since EPA did not promulgate such an exemption applicable to the hourly NO2 standard, existing

---

[2]  The CAA requires that not later than August 7, 1978, EPA "promulgate a national primary ambient air quality standard for NO2 concentrations over a period of not more than 3 hours unless … [the Administrator] finds that there is no significant evidence that such a standard for such a period is requisite to protect public health."  42 U.S.C. § 7409(c).  EPA had previously addressed the issue of short-term exposures to NO2 and the appropriateness of a short term standard in both the 1985 and 1996 NAAQS reviews.  *See* 50 Fed. Reg. 25,532 (June 19, 1985); 61 Fed Reg. 52,852 (Oct. 8, 1996).

[3]  In response to a petition for reconsideration, EPA has recently proposed to repeal section 52.21(i)(1)(xi), in part because EPA adopted this provision without an opportunity for public comment.  75 Fed. Reg  6827, 6833 (Feb. 11, 2010).  EPA previously stayed this provision until June 22, 2010.  74 Fed. Reg. 48,153 (Sept. 22, 2009).

regulations require permits issued after April 12, 2010 to be supported by a demonstration that the proposed source will not violate the hourly NO2 NAAQS. *See* Jordan Decl., Ex. 5, Page Memorandum at 3. Thus, EPA has determined, and notified Avenal on May 5, 2010, that Avenal must show compliance with the hourly NO2 standard in order to obtain a PSD permit. Jordan Decl., ¶¶ 14-15, 17; Joint Stip. at ¶ 10. As discussed more fully *infra*, EPA is currently evaluating, pursuant to section 165(a)(3) of the CAA, whether Plaintiff has demonstrated that emissions from the Project will not cause or contribute to air pollution in excess of the revised NO2 standard. Jordan Decl., ¶¶ 15, 17. Since the promulgation of the revised NO2 standard, EPA has been working with Avenal through a number of letter exchanges and discussions to determine whether the proposed facility will comply with the revised NO2 standard. *See* Pls. Exs. H, J, K, M. On August 17, 2010, Avenal confirmed its intent to provide EPA with additional information and justification concerning its hourly NO2 NAAQS analysis by September 13, 2010 as requested by EPA. Jordan Decl. Ex. 6. On September 13, 2010, EPA received Avenal's submission and is currently reviewing it. Jordan Decl. ¶ 17 and Ex. 7.

On June 22, 2010, EPA published a final rule establishing a primary NAAQS for sulfur dioxide ("SO2") based on a 1-hour averaging time. That rule became effective on August 23, 2010. 75 Fed. Reg. 35,520 (Jun. 22, 2010). EPA has already informed Avenal that it believes that the Project would be in compliance with the hourly SO2 NAAQS. EPA further informed Avenal that it has determined that additional analysis is not required from Avenal to address this standard, given that the Project's SO2 emissions are estimated to be 16.7 tons per year, which is below the significant emissions rate for SO2. *See* 40 C.F.R. §§ 52.21(m)(1) and 52.21(b)(23)(i); Jordan Decl., ¶ 16.

As discussed in the Jordan Declaration, EPA needs until December 31, 2010, to complete its review of Plaintiff's NO2 submissions, and complete the permit decision-making process.[4] Such a deadline will allow EPA Region 9 to evaluate the technical hourly NO2 NAAQS analysis provided by Plaintiff, make a determination regarding the analysis, submit its determinations on the NO2 analysis and the Project's compliance with the 1-hour SO2 NAAQS to the public for comment, consider and respond to comments, and make a well-reasoned and supported final determination on the permit application, so that EPA Region 9's final determination will withstand scrutiny if it is appealed to the Environmental Appeals Board.

## III.   LITIGATION BACKGROUND

Plaintiff filed the Complaint in this matter on March 9, 2010.  When  EPA filed its Answer on May 18, 2010, EPA was still engaged in consultation with FWS regarding the Project, and had not received the FWS's final Biological Opinion.  *See* Answer, Defenses, ¶ 1. As stated above, on August 9, 2010, EPA received the Biological Opinion from the FWS, thereby completing EPA's formal consultation with the FWS under section 7 of the ESA.  *See* Pls. Ex. L.  ESA regulations provide that "[f]ollowing the issuance of a biological opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion."  50 C.F.R. § 402.15(a).  Avenal submitted a letter to EPA Region 9 dated August 16, 2010, indicating its intent to commit to the terms of the Biological Opinion and requesting that the terms of its PSD permit be changed to

---

[4]  This proposed deadline is dependent on EPA Region 9's moving forward with its decision-making process based on the 1-hour NO2 NAAQS analysis submitted by Plaintiff to date, including the submittal received on September 13, 2010.  If Plaintiff requests that EPA consider significant additional information or analysis submitted much later than that date, EPA may need to request an extension from the Court for issuing a final permit decision.  Jordan Decl., ¶¶ 17-22.

include the Biological Opinion's requirements.  Jordan Decl., Ex. 3.   On September 1, 2010,

EPA sent a letter to Plaintiff requesting that Plaintiff provide a letter addendum to its permit

application to include a commitment to comply with the reasonable and prudent measures and

terms and conditions included in the Biological Opinion, in lieu of EPA's changing the permit's

requirements, consistent with the terms of the Biological Opinion[5] and EPA practice.  Jordan

Decl., Ex. 4.  EPA has not received the requested permit application addendum letter from

Avenal to date, but anticipates that it will receive this document shortly.  Jordan Decl., ¶ 12.  If

Avenal promptly submits an adequate commitment letter, EPA will be able to conclude its ESA

section 7 obligations for purpose of making a final decision on Plaintiff's permit application,

consistent with 50 C.F.R. § 402.15(a).  Jordan Decl., ¶ 12.

However, as explained *supra* in Part II of the Background Section, while review of

Avenal's permit application remained pending, EPA promulgated an additional NAAQS for

NO2, based on a 1-hour averaging time.  EPA is currently evaluating, pursuant to section

165(a)(3) of the CAA, whether Plaintiff has demonstrated that emissions from the Project will

not cause or contribute to air pollution in excess of the revised NO2 standard.  Jordan Decl. ¶ 15.

As discussed more fully *infra*, EPA will need until December 31, 2010, to follow the appropriate

---

[5]  The Biological Opinion's reasonable and prudent measures include, *inter alia*,  the
following:

> 2. Prior to PSD permit issuance, the applicant will submit a revised PSD permit
> application that includes the terms and conditions contained within this biological
> opinion. Including the terms and conditions of the biological opinion within the
> applicant's PSD permit application requires the applicant to adhere to those terms and
> conditions to remain in compliance with the PSD permit requirements.
> 3. The EPA shall forward to the Service a copy of the applicants' revised application
> containing the provisions of the biological opinion for the Service to review.

Pls. Ex. L at 29.

procedures to evaluate the information, provide the public with notice and an opportunity to

submit written and oral comments on EPA's determination concerning Plaintiff's NO2 NAAQS

data and other related matters, consider and respond to comments, and grant or deny the permit

application.

Plaintiff filed a motion for judgment on the pleadings requesting injunctive and

declaratory relief on August 25, 2010.  For the following reasons, the Court should deny

Plaintiff's requested relief, and grant Defendants' proposed remedy instead.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

"should be rendered if the pleadings, . . .  and any affidavits  show that there is no genuine issue

as to any material fact and that the movant is entitled to a judgment as a matter of law."  *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 n.4 (1986) (citing *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247 (1986)).

## ARGUMENT

## I.   THIS COURT HAS EQUITABLE DISCRETION TO DETERMINE A REASONABLE SCHEDULE FOR AGENCY ACTION.

A district court has broad discretion to fashion equitable remedies.  *Weinberger v. Carlos*

*Romero-Barcelo*, 456 U.S. 305, 311-13 (1982); *American Lung Ass'n v. Browner*, 884 F. Supp.

345, 347 (D. Ariz. 1984).  In a suit alleging violation of a Congressionally mandated duty, the

district court exercises its discretion to fashion a remedy by considering whether "the official

involved . . . has in good faith employed the utmost diligence in discharging his statutory

responsibilities."  *NRDC v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1975).  "The sound discretion of

[a] . . . court does not embrace enforcement . . . of a party's duty to comply with an order that

calls [on] him to do an impossibility." *Natural Resources Defense Council v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1975) ("*Train*").  Indeed, "it would be inappropriate to set an infeasible schedule in order to punish a delinquent agency." *Sierra Club v. Thomas*, 658 F. Supp. 165, 172 (N.D. Cal. 1987).  Thus, a statutory deadline should not be enforced to the extent that it is impossible or infeasible to comply with such a deadline. *American Lung Association v. Browner*, 884 F. Supp at 347.

In *Train*, the leading case on the subject of an agency's failure to meet statutory deadlines, the D.C. Circuit recognized two types of circumstances that might necessarily delay agency action and make it infeasible to comply with a particular deadline: (1) budgetary and manpower constraints, and (2) the need for an agency to have more time to sufficiently evaluate complex technical issues.  510 F.2d at 712-13.  With respect to the latter, "[t]he public has a significant interest in ensuring that the government does not [act] via a process that emphasizes expediency over quality and accuracy." *Cronin v. Browner*, 90 F. Supp. 2d 364, 373 (S.D.N.Y. 2000).  In setting deadlines, courts have considered the agency's need for time to act in a manner that would withstand the scrutiny of subsequent challenge. *See Sierra Club v. Thomas*, 828 F.2d 783, 798-99 (D.C. Cir. 1987); *United Steelworkers of America v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1120 (D.C. Cir. 1986) (holding judicial imposition of overly hasty timetable on agency would ill serve the public interest); *Maine Ass'n of Handicapped Persons v. Dole*, 623 F. Supp. 920, 926 (D. Me. 1985) (recognizing "the need to implement clear and effective regulations capable of withstanding the scrutiny of challenges following enactment.").  In short, when an agency has missed a statutory deadline, a court should examine the relevant facts and circumstances and evaluate the time frame needed by the agency to make well-reasoned,

scientifically supportable, and defensible decisions.

## II.     THE REMEDY PROPOSED BY PLAINTIFF EXCEEDS THE SCOPE OF THE REMEDY AUTHORIZED BY THE CITIZEN SUIT PROVISION.

Because this is a suit against the United States, this Court has jurisdiction only to the extent that the United States has waived its sovereign immunity.  The Supreme Court has repeatedly held that "[w]aivers of immunity must be construed strictly in favor of the sovereign . . . and not enlarged beyond what the language requires."  *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685-86 (1983) (quoting cases).  Where the United States has consented to be sued, the terms of that waiver of sovereign immunity define the extent of the court's jurisdiction."  *United States v. Sherwood*, 312 U.S. 584, 586 (1941).

Under the Clean Air Act, the citizen suit provision provides a waiver of sovereign immunity for claims alleging that the agency has failed to perform a nondiscretionary duty under the Act.  42 U.S.C. § 7604(a).  In fashioning a remedy to address such a failure, district courts do not have jurisdiction to review the substance of the agency's decisionmaking, or "direct the manner in which any discretion given the Administrator  . . . should be exercised."  *NYPIRG v. Whitman*, 214 F. Supp. 2d 1, 3 (D.D.C. 2002) (holding that the plaintiffs were not entitled to discovery since the court lacked power to grant equitable relief beyond setting a deadline for action required by the CAA provisions before the court).  "Notably, the CAA does not allow district courts to address the content of EPA's conduct, issue substantive determinations on its own, or grant other forms of declaratory relief."  *Sierra Club v. Browner*, 130 F. Supp. 2d 78, 90 (D.D.C. 2001).  Rather, the CAA specifically limits district courts' jurisdiction to "order[ing] the Administrator to perform such act or duty."  42 U.S.C. § 7604(a).

Here, Plaintiff's request for relief goes far beyond that permitted by statute.  Plaintiff

14

requests that the Court (1) order EPA to "[g]rant the PSD permit application for the Project . . .

before December 31, 2010; (2) "[p]rohibit the Agency from retroactively imposing the new

emission standards on Avenal's permit application;" and  (3) order EPA to "[t]ake other

appropriate actions to remedy, mitigate, and offset the harm to Plaintiff caused by [EPA's]

disregard of their statutory duty. . . ."  Plaintiff's Proposed Order, Docket Entry 12-1.  Moreover,

in its Memorandum in Support, Avenal asks this Court to order the Administrator herself to issue

the permit, thus eliminating the possibility of an administrative appeal.  *See* Plaintiff's

Memorandum in Support at 28 (asking the Court to issue "an order preventing the Agency from

retroactively imposing new emission standards in this case and requiring the Administrator to

issue a decision, conclusive of all internal EPA proceedings and constituting final agency action,

that grants Avenal's pending PSD permit by December 31, 2010").  By asking the Court to order

the EPA *Administrator* to *grant* Plaintiff's application, Plaintiff is asking the Court to not only

prescribe EPA's substantive decision on the application, but also to foreclose access by

interested parties to the EAB appeal process provided  by EPA's regulations.  *See* 40 C.F.R. §

124.19.  Additionally, by asking the Court to prohibit EPA from retroactively imposing new

emission standards on Avenal's permit application, and order EPA to take action to remedy or

mitigate harm to Plaintiff caused by EPA's failure to meet its statutory duty, Plaintiff is asking

the Court to grant declaratory relief beyond setting a reasonable deadline for the agency to meet

its duty.  As the case law summarized above establishes, the Court has no jurisdiction to grant

such relief.

**III.    EPA'S PROPOSED SCHEDULE REPRESENTS THE REASONABLE MINIMUM
         TIME NECESSARY FOR EPA TO COMPLETE THE REQUIRED ACTION.**

As detailed in Parts II and III of the Background section *supra*, and established in the

15

Joint Stipulation of Facts and Jordan Declaration, EPA Region 9 has acted in good faith and with "utmost diligence" in processing Plaintiff's permit application.  Specifically, EPA Region 9 requested and received additional information from Avenal after receiving the initial application and after deeming the application complete, received Avenal's biological assessment and initiated the consultation process with FWS under the ESA, facilitated communication between Avenal and FWS during the consultation process, commented on FWS's draft Biological Opinion, and contacted FWS regularly to inquire about the status of the final Biological Opinion, which was not issued by FWS until August 9, 2010.  *See* Joint Stip. ¶ 6; Jordan Decl., ¶¶ 9-11. EPA also worked with Avenal through a number of letter exchanges and discussions to determine whether the Project will comply with the new hourly NO2 standard, which came into effect after EPA determined that Avenal's application was complete but before the final Biological Opinion was issued.  *See* Joint Stip. ¶ 6; Jordan Decl., ¶¶ 13-17.

While Plaintiff's frustration with the requirement that it show compliance with the hourly NO2 NAAQS promulgated after EPA determined that its application was complete is understandable, EPA has a statutory obligation to review and revise the NAAQS every five years.  The Agency's review of the NAAQS for NO2 was several years overdue at the time Plaintiff submitted its application in 2008.  As explained more fully *infra,* EPA's interpretation of the CAA and its regulations as requiring compliance with NAAQS in effect at the time of the final permit decision is reasonable.  Furthermore, while EPA regularly contacted FWS about the status of the final Biological Opinion, EPA does not control the timing of FWS's issuance of its Biological Opinions.

As discussed in the Jordan Declaration, EPA needs until December 31, 2010, to complete

16

its review of Plaintiff's NO2 submissions, and complete the permit decision-making process.[6]

Such a deadline will allow EPA Region 9 to evaluate the technical hourly NO2 NAAQS analysis

provided by Plaintiff, submit its determinations on the NO2 analysis and the Project's

compliance with the hourly SO2 NAAQS to the public for comment, consider and respond to

comments, and make a well-reasoned and supported final determination on the permit

application, so that EPA Region 9's final determination will withstand scrutiny if it is appealed

to the Environmental Appeals Board.

Specifically, Plaintiff submitted additional information concerning its compliance with

the hourly NO2 standard on September 13, 2010.  EPA will review and evaluate that information

and analysis, and consider whether any modifications to the permit's emissions limitations or

other aspects of its permit decision documentation will be necessary in conjunction with its

review of that information and analysis.  Jordan Decl.. ¶ 20.  EPA will then prepare a written

determination concerning Avenal's demonstration of compliance with the hourly NO2 NAAQS

and any other necessary modifications to the permit's emissions limitations or other aspects of its

permit decision documentation, which EPA would make available for public review and

comment.  Jordan Decl.,  ¶ 20.

EPA would concurrently prepare a public notice that would notify and seek comment

from the public about EPA's determination whether Avenal has demonstrated compliance with

the revised NO2 standard and the revised SO2 standard and other relevant information

---

[6]  This proposed deadline is dependent on EPA Region 9's moving forward with its decision-making process based on the 1-hour NO2 NAAQS analysis submitted by Plaintiff to date, including the submittal received on September 13, 2010.  If Plaintiff requests that EPA consider significant additional information or analysis submitted much later than that date, EPA may need to request additional time to reach a decision.  Jordan Decl., ¶¶ 17, 22.

concerning the proposed permit decision that arises in the context of EPA's review of the 1-hour

NO2 NAAQS analysis.  Jordan Decl., ¶ 20.  This notice will also propose a public hearing,

which would need to be held at least thirty-three days after the date of the public notice.   Jordan

Decl.,  ¶ 20.    Having recently received the additional hourly NO2 analysis from Avenal, EPA

will also move forward with making arrangements for the public hearing, including, among other

things, setting a date and location for the hearing, and arranging for a hearing officer, a court

reporter, and a translator for the public hearing.  Jordan Decl., ¶ 20.  EPA believes that it will

need approximately six weeks to accomplish all of the tasks described above and publish the

notice.  *Id.*

Consistent with EPA regulatory timeframes, the public hearing and comment period

would last approximately thirty-three days from the date of the public notice announcing both the

comment period and the hearing.  After the close of the public comment period, EPA would use

the next four weeks to consider and prepare a response to comments received during the

comment period and public hearing, make any necessary changes to the permit and associated

documents, prepare final decision documents, and issue a final decision.  Jordan Decl., ¶ 21.  In

summary, EPA Region 9 requires a minimum of three and one-half months starting with its

receipt of Avenal's September 13, 2010, hourly NO2 NAAQS analysis—assuming that analysis

is not significantly supplemented after that date—to complete the permit review process,

including the public participation process, and issue a final permit decision.  Thus, Region 9 will

be able to issue a final permit decision no earlier than December 31, 2010.  Jordan Decl., ¶¶ 19-

21.

Plaintiff argues that EPA cannot lawfully withhold action on the permit application in

18

order to "retroactively" impose the new NO2 standard, and asks this Court to prohibit EPA from applying any new standards retroactively.  *See* Plaintiff's Memorandum in Support at 14-16. Although EPA disputes that this Court has jurisdiction to consider such a question or grant such relief in a deadline suit like this one, *see* discussion of Court's authority in Part II of the Argument *supra*, EPA's interpretation of the CAA requiring EPA to apply the standards in effect, including the hourly NO2 standards, at the time of its final permit decision is reasonable.

Indeed, as noted *supra*, the plain language of both the Clean Air Act and applicable regulations require a PSD permit applicant to demonstrate that its facility will not cause or contribute to a violation of "any" NAAQS.  *See* 42 U.S.C. § 7475(a)(3); 40 C.F.R. § 52.21(k). Since at least 1987, EPA has consistently interpreted the plain language of the Clean Air Act to require that each final PSD permit decision reflect consideration of any NAAQS in effect at the time the permitting authority issues a final permit.  *See* Jordan Decl., Ex. 5, Page Memorandum. Supreme Court precedent and other cases support EPA's interpretation that permitting and licensing decisions of regulatory agencies must reflect the law in effect at the time the agency makes a final determination on a pending application.  *See Ziffrin, Inc. v. United States*, 318 U.S. 73, 78 (1943); *State of Alabama v. EPA*, 557 F.2d 1101, 1110 (5th Cir. 1977).  Accordingly, EPA's determination that the NO2 standards apply to Plaintiff's permit application is reasonable under the plain language of the CAA and the corresponding regulations, and is supported by Supreme Court precedent and case law.

Plaintiff cites *Landsgraf v. USI Film Products*, 511 U.S. 244 (1994), in support of its argument that "EPA actions in this case . . . fly in the face of numerous court decisions disfavoring the retroactive application of new requirements."  Plaintiff's Memorandum at 15.

Yet in *Landsgraf*, the Supreme Court stated that a retroactive requirement is one that "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past." *Landsgraf*, 511 U.S. at 269. "A statute [or rulemaking] does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's [or rule's] enactment, or upsets expectations based in prior law." *Id.* (citations omitted).

Here, Plaintiff has not established that it acquired any rights by virtue of the submission of its permit application or the determination by EPA that its application was complete. In fact, nothing in CAA section 165, or elsewhere in the Act, establishes that Plaintiff is entitled to a decision on its permit application on the basis of the laws and regulations in effect at the time that permit application was submitted or deemed complete, or indeed that Plaintiff is necessarily entitled to have EPA grant, rather than deny, its application. *See generally* 42 U.S.C. § 7475. EPA did not promulgate any regulation exempting applications complete prior to April 12, 2010, from having to address the hourly NO2 NAAQS. Thus, Plaintiff has no basis for such an expectation, let alone a vested right to the permit's issuance without demonstrating compliance with the 1-hour NO2 NAAQS promulgated during EPA's review of the permit application.

EPA's proposed schedule represents the reasonable minimum time necessary for EPA to complete review of Plaintiff's hourly NO2 NAAQS submissions, which EPA reasonably interprets the CAA to require, and proceed through the public notice and comment procedures to grant or deny Plaintiff's permit application. Thus, because Plaintiff has requested relief that exceeds the scope of remedy authorized by the citizen suit provision, and EPA's proposed remedy is reasonable and serves the public interest, EPA respectfully requests that the Court

grant the Regional Air Division Director until December 31, 2010, to grant or deny Plaintiff's permit application

## CONCLUSION

For the foregoing reasons, the Court should deny the relief requested by Plaintiff and instead grant EPA's motion on remedy.

Dated: September 17, 2010                     Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
_____/S/_____
STEPHANIE J. TALBERT, Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, D.C. 20026-3986
Telephone:      (202) 514-2617
Facsimile:      (202) 514-8865
E-mail:           stephanie.talbert@usdoj.gov
*Counsel for Defendant*

BRIAN DOSTER
United States Environmental Protection Agency
Office of General Counsel
Ariel Rios Building
1200 Pennsylvania Ave. NW
Washington. D.C. 20460
Telephone:      (202) 564-4047
E-mail:doster.brian@epa.gov

JULIE WALTERS
United States Environmental Protection Agency,
Region 9
75 Hawthorne St., Mail Code ORC-2
San Francisco, CA  94105

Telephone:  415-972-3892
Email:  walters.julie@epa.gov
*Of Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing DEFENDANTS'
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE PLEADINGS AND IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT with the clerk of the court for the United
States District Court for the District of Columbia using the electronic case filing system of the
court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following
attorneys of record:


LaShon K. Kell

Jeffrey R. Holmstead

BRACEWELL & GIULIANI LLP

2000 K Street, NW, Suite 500

Washington, DC 20006




   */s/ Stephanie J. Talbert*
STEPHANIE J. TALBERT